J-A28018-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: B.M.F., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: E.T.F., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 859 MDA 2021 |

Appeal from the Decree Entered May 26, 2021
In the Court of Common Pleas of Lancaster County Orphans' Court at
No(s): 2097 of 2019

| | | |
|---|---|---|
| IN RE: L.S.F., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: E.T.F., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 860 MDA 2021 |

Appeal from the Decree Entered May 26, 2021
In the Court of Common Pleas of Lancaster County Orphans' Court at
No(s): 2098 of 2019

BEFORE: LAZARUS, J., NICHOLS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY NICHOLS, J.: **FILED: JANUARY 19, 2022**

Appellant E.T.F. (Father) appeals from the decrees granting the petitions

of Appellee the Lancaster County Children and Youth Service Agency (Agency)

_____

[*] Former Justice specially assigned to the Superior Court.

to terminate his parental rights to B.M.F. and L.S.F. (collectively, Children) pursuant to 23 Pa.C.S. § 2511(a) and (b).[1]  We affirm.

The trial court summarized its findings of fact as follows:

1. L.S.F. was born [in June 2017].

2. B.M.F. was born [in September 2012].

3. In the spring of 2018, the Lancaster County Drug Task Force was engaged in surveillance of the home of Mother and Father [(collectively, parents)].

4. The Agency, after being advised of the Drug Task Force investigation, began an investigation into the safety of L.S.F.

5. At this time, B.M.F. was staying with a relative under an informal arrangement and was not residing with Mother and Father.

6. The Agency filed its petition for custody of L.S.F. on April 10, 2018.

7. At the adjudication disposition hearing held on April 26, 2018, the parents were granted a child's permanency plan [for L.S.F.]. The plan established a primary permanency goal of return to parent and a concurrent permanency goal of placement for adoption.

8. The child's permanency plan for L.S.F. had the following objectives for both parents: (a) to improve mental health functioning to the extent that the parents can care for the child; (b) to remain free from drugs and misuse of alcohol; (c) to learn and use good parenting skills; (d) to be financially stable in order to provide for themselves and the child; (e) to obtain and maintain a home free and clear of hazards for themselves and the child; and, (f) to maintain an ongoing commitment to the child. . . .

9. Approximately one month after L.S.F. came into the Agency's care, B.M.F.'s caregiver requested that B.M.F. be removed from

_____

[1] This Court consolidated Father's appeals on July 9, 2021.  We separately consider the appeals of the Children's mother, A.D.C. (Mother) at 793 and 794 MDA 2021 in J-A28017-21.

her care and the Agency then filed a petition for custody of B.M.F. [On August 2, 2018, the trial court adjudicated B.M.F. dependent.]

10. In respect to B.M.F., on August 2, 2018, the parents were granted a child's permanency plan with a primary permanency goal of return to parent and a concurrent permanency goal of adoption.

11. The child's permanency plan for B.M.F. had the following objectives for both parents: (a) to improve mental health functioning to the extent that the parents can care for the child; (b) to remain free from drugs and misuse of alcohol; (c) to learn and use good parenting skills; (d) to be financially stable in order to provide for themselves and the child; (e) to obtain and maintain a home free and clear of hazards for themselves and the child; (f) to maintain an ongoing commitment to the, child; and (g), to develop an understanding of sexual victimization. . . .

12. The overriding concerns for both parents that necessitated placement of the Children were mental health concerns affecting the parents and substance abuse by the parents, along with Mother's involvement with the criminal justice system.

13. The parents made substantial progress on their . . . permanency plan objectives between August of 2018 and February of 2019. Consequently, the Agency recommended release of physical custody of the Children to them, which the court granted on February 7, 2019.

14. A family service plan was approved which required the parents to continue to engage in drug and alcohol treatment, submit to random drug screens, continue with the parent educator, and ensure the safety of the Children. The parents were advised that failure to abide by the family service plan would result in the Children being re-placed into the care of the Agency.

15. On February 22, 2019, the Agency was notified that L.S.F. had some type of seizure and had been admitted to Hershey Medical Center.

16. The parent educator was present in the home when she observed L.S.F. acting strangely; it was the parent educator who insisted that L.S.F. be taken to Hershey Medical Center, not the parents.

17. L.S.F.[, who was less than two years old at the time,] ingested some type of amphetamine that caused her to have a seizure.

18. Upon notification that L.S.F. was at Hershey Medical Center, a drug screener was sent to the home of the parents. Mother tested positive for cocaine and the Agency again filed for physical custody of the Children. [The trial court granted the Agency temporary custody of the Children on February 22, 2019, and entered a shelter care order placing the Children in the Agency's care on March 6, 2019.]

19. The parents did not offer an explanation as to how [L.S.F.] ingested the amphetamine.

20. After the re-placement of the Children, the parents were again given child[ren's] permanency plans for reunification with the same objectives as were on the prior plans, with the exception that the plan in respect to B.M.F. omitted the objective to develop an understanding of sexual victimization which had been included in the previous child's permanency plan. [The Agency placed the Children with their current resource parents in June 2019].

21. The parents had not completed the parenting objective at the time of the re-placement.

22. Father lied to the caseworker on February 14, 20[19]; when he indicated he was on vacation to be with the girls, when, in fact he had been laid off from his employment.

23. By a month and a half after the Children's re-placement, Father was overwhelmed that the Children were again in the physical custody of the Agency to the point that he was unable to pursue his child's permanency plan objectives.

*    *    *

25. Between February and June 2019, the parents avoided being drug-screened.

26. The parents had undergone psychological evaluations at the beginning of the case and the recommendations were for mental health treatment, drug and alcohol evaluations, and medication management. Also, for Father, couples counseling with Mother was recommended.

27. The parents indicated that each of them is preventing the other parent from being successful in completing their child

- 4 -

permanency plan objectives. They have a co-dependent relationship.

28. Mother and Father's co-dependence has prevented them from being able to parent the Children and the passage of time confirms their co-dependence will continue.

\* \* \*

36. The caseworker had extended discussions with Father in March of 2019 to attempt to have him work on his plan because he was quite despondent.

\* \* \*

37. Father was unsuccessfully discharged from the Blueprints drug and alcohol program on February 28, 2019, due to missed appointments.

38. At that time, Father tested positive for Suboxone. Father did not then have a prescription for Suboxone. He indicated he took Suboxone because of his diseased kidneys.

39. Father indicated that he obtained the Suboxone from another source and not from Mother[, who had a prescription for Suboxone].

40. Father has polycystic kidney disease.

41. The caseworker advised Father to get medication management in place for his pain and to look into a possible kidney transplant. [On September 3, 2019, the Agency filed petitions to terminate parents' rights to the Children pursuant to Section 2511(a)(1), (2), (5), (8), and (b).[2]]

42. The parents briefly worked with a parent educator prior to the re-placement of the Children, but due to their non-compliance with the drug and alcohol and mental health objectives after the Children came back into the Agency's care, a parent educator had not yet been re-assigned to them as of September 3, 2020.

---

[2] The trial court by order dated January 17, 2020, appointed Kathleen E. Holmes, Esq. as the Children's legal interest counsel. **See generally In re Adoption of L.B.M.**, 161 A.3d 172 (Pa. 2017). Gina M. Carnes, Esq. appeared as the Children's guardian *ad litem* (GAL).

43. Father has no other children. Mother has two [other] older children, one of whom was approximately 19 years old and a younger [child] about 10 years of age as of September 3, 2020. Mother's younger child is being raised by his father.

\*     \*     \*

46. Father and Mother have maintained employment through the history of the case.

47. In general, Father and Mother's visits with the [C]hildren have gone well.

\*     \*     \*

49. B.M.F. gets upset when Mother fails to appear for visits.

50. During visits, Mother and Father have an over-reliance on phones and food to keep the Children engaged.

51. The parents have resided together for the duration of this case.

52. The re[-]placement into the physical custody of the Agency was devastating for the Children.

53. When B.M.F. was re-placed, she was picked up from school and was devastated and hysterical.

54. B.M.F. is always concerned that her parents are happy and does not want to say or do something that would upset them.

55. B.M.F. knows that she is not safe with her biological parents because they use drugs.

56. In January 2020, both parents were attending counseling for drug[s] and alcohol but not counseling for mental health.

57. The parents re-engaged with mental health counseling on June 16, 2020.

58. As a result of the COVID-19 pandemic which caused the imposition of stay-at-home orders beginning in March 2020, the Agency was unable to drug screen the parents again until July 21, 2020.

59. The results of the July 20, 2020, drug screen[s] were positive for both parents. Father tested positive for Suboxone (for which

by then had a valid prescription) and Mother tested positive for methamphetamine and amphetamine.

60. In June of 2020, Father was on a waiting list for a kidney transplant but continued to work part-time.

61. As of June 2020, the Children had been in the same resource home for one year. The resource family was and remains a permanent resource for the Children.

62. The bonding assessment concluded that Mother and Father love the Children[,] but they have failed to do the needed things to provide stability for the Children. The evaluator recommended termination of the parental rights.

63. The evaluator noted that during the visit between the parents and the Children that each parent took a child and did something with that child; there was no indication of a sense of family or a connection between the [Children].

64. During the visit between the . . . parents and the Children, the evaluator noted that the parents used their phones as a distraction instead of engaging with the Children.

65. The evaluator noted that B.M.F. is much more bonded to her . . . parents than is L.S.F., as L.S.F. has spent practically her entire life with the resource family.

66. The evaluator supports the Children having ongoing contact with the . . . parents as long as the Children desire it.

67. B.M.F. is presently engaged in school-based counseling.

68. The resource parents had adopted another child with whom the two girls have a close relationship.

69. The child preparation worker had worked with B.M.F. for four rounds of ten one-hour sessions over a period of 18 months.

70. According to the child preparation worker, B.M.F. knows why she was placed in the custody of the Agency and then re[-]placed the second time.

71. The child preparation worker's last session with B.M.F. was in approximately October of 2020.

72. At that last session, B.M.F. indicated she loves her biological parents as well as her resource parents but she is reluctant to

state her love for the resource parents because that would hurt her biological parent's feelings.

73. At the time of the last permanency review hearing, the Children had been in the care of the Agency for three years, less the two weeks with the biological parents before being re-placed, and the parents still had not completed their child permanency plan objectives.

74. L.S.F. is adamant that she wants to live with the resource parents.

75. B.M.F., in the five months prior to the April 9, 2021, hearing, stated to [the GAL] that she wants to live with the resource parents but would like to still see her . . . parents.

76. B.M.F. called her legal interest attorney on February 2, 2021, and was very upset because she had a bad dream the night before.  In her dream, B.M.F. and L.S.F. were living with their . . . parents and L.S.F. ate something bad and died.

77. B.M.F. told her legal interest attorney she wants to live with the resource family but fears her . . . parents will be mad when they hear that.

78. The [court appointed special advocate (CASA)] recommended to the court that the parental rights should be terminated.

79. The Children's [GAL] recommends termination of the parental rights.

Trial Ct. Op., 8/10/21, at 31-43 (citations omitted).  On May 26, 2021, the trial court entered decrees terminating Father's parental rights.

Father timely filed notices of appeals and statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).  The trial court filed a responsive opinion.

Father presents the following issues for our review:

1. The [A]gency failed to prove by clear and convincing evidence under 23 Pa.C.S. Section 2511(a)(1) that Father evidenced a settled purpose of relinquishing his parental claim to [the

- 8 -

C]hildren or has refused or failed to perform his parental duties for a period of six (6) months immediately preceding the filing of the Petition when Father at all times desired to exercise his parental claim to [the C]hildren and was never provided the opportunity to perform his parental duties; the Trial Court also erred in determining it would be in the [C]hildren's best interest to terminate Father's parental rights.

2. The [A]gency failed to prove by clear and convincing evidence under 23 Pa.C.S. Section 2511(a)(2) that Father's repeated and continued incapacity has caused [the C]hildren to be without essential parental care, control or subsistence necessary for [the C]hildren's physical and mental well-being when Father was never provided the opportunity to show the Agency that he did not have an incapacity and that he could provide essential parental care, control and subsistence necessary for the [Children's] physical and mental well-being.

3. The [A]gency failed to prove by clear and convincing evidence under 23 Pa.C.S. Section 2511(a)(5) that the conditions which led to the initial removal or placement of the [C]hildren continued to exist, Father cannot or will not remedy those conditions within a reasonable period of time, the services and assistance reasonably available to Father are not likely to remedy the conditions which led to the removal or placement of the [C]hildren within a reasonable period of time, and that termination of Father's parental rights would best serve the needs and welfare of the [C]hildren when the conditions that led to the initial placement of the [C]hildren did not exist since the initial placement of the [C]hildren, the Agency refused to provide the services and assistance to Father to remedy the conditions, and that termination of parental rights does not serve the best needs and welfare of the [C]hildren.

4. The [A]gency failed to prove by clear and convincing evidence under 23 Pa.C.S. Section 2511(a)(8) that the conditions which led to the removal or placement of the [C]hildren continued to exist and termination of Father's parental rights would best serve the needs and welfare of the [C]hildren when the conditions that led to the removal or placement of the [C]hildren did not exist at the time of the filing of the Petition nor at the time of the hearing and that termination of Father's parental rights would not serve the needs and welfare of the [C]hild[ren].

Father's Brief at 4-5.

Initially, we note that the following principles govern our review.

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. [**In re R.J.T.**, 9 A.3d 1179, 1190 (Pa. 2010)]. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

As we discussed in **R.J.T.**, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012) (some citations omitted); *see also Interest of S.K.L.R.*, 256 A.3d 1108, 1123-24 (Pa. 2021) (emphasizing that "[w]hen a trial court makes a 'close call' in a fact-intensive case . . . the appellate court should not search the record for contrary conclusions or substitute its judgment for that of the trial court")

- 10 -

The burden is on the petitioner "to prove by clear and convincing evidence that [the] asserted grounds for seeking the termination of parental rights are valid." ***In re R.N.J.***, 985 A.2d 273, 276 (Pa. Super. 2009). We have explained that "[t]he standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" ***Id.*** (citation omitted).

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b) . . . .

***In re L.M.***, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). This Court "may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a)." ***In re M.T.***, 101 A.3d 1163, 1179 (Pa. Super. 2014) (*en banc*) (citation omitted).

### Involuntary Termination Under Section 2511(a)(2)

We first address the involuntary termination of Father's parental rights under Section 2511(a)(2). ***See id.*** Father claims that the trial court erred in terminating his parental rights because he substantially complied with the Children's permanency plans and demonstrated a commitment to the Children. Father's Brief at 26-27. Father contends that when the Agency

removed the Children for the second time in March 2019, he "became extremely upset and overwhelmed." *Id.* at 12. He asserts that he overcame his difficulties by the time the trial court terminated his parental rights and that the trial concerns focused unfairly on the timeliness of achieving his objectives. *Id.* at 18.

Father specifically claims that the trial court erred in finding parental incapacity when he "overcame his substance abuse" and because he believed his drug and alcohol counseling satisfied his mental health counseling because "he got so much out of it." *Id.* at 29. He contends that he completed mental health counseling, but that it was less beneficial than his drug and alcohol counseling. *Id.*

Father asserts that the trial court erred in emphasizing his co-dependency to Mother and contends that he "is not mentally unstable as the court suggests, nor is he a drug addict." *Id.* Further, Father notes that the trial court's finding that he failed to complete parenting classes, but he argues that the Agency failed to make referrals for parenting classes until January 2021. *Id.* at 29-30.

The Agency, the GAL, and the Children's legal counsel (collectively Appellees) respond that the Agency presented clear and convincing evidence to terminate Father's parental rights. Agency's Brief at 15-16; GAL's Brief at 18-19; Legal Interest Counsel's Brief at 4. The Agency contends that "[u]ltimately, the trial court found that due to the long history of mental instability and history of substance abuse, the parents were not in a position

to provide a safe home, parental care and stability for the Children." Agency's Brief at 22. Appellees further counter that the trial court properly concluded that Father knew about his objectives, including his mental health goals, and the GAL, for example, asserts that Father made excuses or his lack of progress, and feigned confusion, but "squandered time." GAL's Brief at 19, 21; *see also* Agency's Brief at 11.

Section 2511(a)(2) states:

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S. § 2511(a)(2).

This Court has addressed the incapacity to parent under Section 2511(a)(2) as follows:

A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.

*S.P.*, 47 A.3d at 827 (citations omitted). This Court has noted that "a child's life cannot be held in abeyance while a parent attempts to attain the maturity

- 13 -

necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006).

Instantly, the trial court concluded that the termination of Father's parental rights was proper pursuant to Section 2511(a)(2). The trial court reasoned:

> Due to the co-dependent nature of Mother and Father's relationship, if Mother were to succumb to using drugs again, Father's ability to parent would be adversely impacted and the Children would be at risk. Father remains trapped in his co-dependency and devotion to Mother which makes him unable to parent the Children. The parent's plan objective in respect to parenting skills was not completed. Father has chosen Mother over the Children. Mother and Father's mental stability and history of substance abuse casts a huge shadow over their ability to provide a safe home, parental care, and stability for the Children. Mother and Father's refusal to address those risks render them incapable of providing the essential care the Children need to flourish. As such, it is appropriate that Mother and Father's parental rights should be terminated.

Trial Ct. Op. at 26.

Our review of the record reveals the following. The bonding evaluator, Diane Edmonds, M.S., testified that Mother and Father were "entrenched in unhealthy patterns of addictions, deceit and codependency." N.T., 3/11/21, at 20. Ms. Edmonds noted that the Agency recommended that Father leave Mother and attempt to reunify with the Children by himself, that Father stated he would do so, but that he did not separate from Mother. *Id.* at 21. Ms. Edmonds stated that Father, when he was with Mother, showed a pattern "at

times" of not being "forthright about what was actually going on with [Mother]." *Id.* at 19.

Ms. Edmonds' initial report dated January 9, 2020 further stated:

[T]here is a bond but we cannot ignore the original risk factors associated with [Father] and [Mother] that have still not been addressed. Additionally, we cannot trust that mere words within this family matter. We can only trust patterns of behavior. The pattern is that while [Father] says he will pick [the Children] over [Mother] if needed, he has not done so. In fact, the pattern is that he continues to cover for her. [W]hen [Father] met with the evaluator for his interview he knew that [Mother] was in jail and never mentioned it to the evaluator and did not mention it to [the caseworker]. The pattern is that [Mother] has said she is sober but avoids probation. Minutes after she told the evaluator she was not longer using drugs, she never came back from her cigarette break to do a urine screen. The evaluator . . . sees that [Father] and [Mother] are likeable people that love [the Children] but they have also failed to do the things needed to show that they are stable to take care of [the Children].

* * *

. . . As noted above the risk factors of the [parents'] home have not been resolved and there is no confidence that any additional time for the family to make changes is going to change this status. The . . . parents are entrenched in unhealthy patterns of addiction, deceit and codependency. To continue to have [the Children] in a waiting game for their parents to finally make meaningful change is only delaying their access to a permanent home.

Agency's Ex. 2, Bonding Evaluation, 1/9/20, at 20, 22.

The record indicates that the trial court credited Ms. Edmonds' opinions concerning Father's co-dependency to Mother and the risks that this behavior posed to Father's ability to provide safety and stability for the Children. **See** Trial Ct. Op. at 26; N.T., 3/11/21, at 20; Agency's Ex. 2 at 20, 22. The record further confirmed that while Father stated his intent to seek reunification with

the Children without Mother, he did not do so. **See** N.T., 3/11/21 at 21, 103 (indicating that Mother and Father lived at the same residence for fourteen months). Further, Father blames the Agency for the delays in his attempts to complete his objectives, but he fails to acknowledge that his own conduct, including his failure to engage in the recommended mental health treatment in a timely manner, prevented referrals for parenting classes. **See id.** at 64-66; **see also** N.T. 9/3/20 at 85.

Moreover, although Father's asserts that he overcame his addictions and mental health issues, the record indicates that throughout the history of the case Father demonstrated his inconsistent compliance and lack of candor with the Agency. In one instance, following the Children's second removal from parents' home in February 2019, Father refused drug screens and began taking Suboxone without a prescription. **See** Trial Ct. Op. at 35, 37; N.T., 9/3/20, at 15, 25. Further, around the time L.S.F. ingested amphetamines, Father told the Agency that he was on vacation from work when in fact he lost his job. **See** Trial Ct. Op. at 11; N.T., 9/3/20 at 13.

Accordingly, there is support in the record for the trial court's findings and conclusions that Father's co-dependency to Mother, Father and Mother's mental stability, and their history of substance abuse "casts a huge shadow" over Father's ability to provide a safe home, parental care, and stability for the Children. **See** Trial Ct. Op. at 26. Further, we find no abuse of discretion in the trial court's determination that Father failed to complete the permanency plan objectives and did not address the safety risks to Children

which rendered both parents "incapable of providing the essential care the Children needed to flourish." *See id.* at 26. Accordingly, as the record supports the trial court's analysis, we discern no basis to disturb the trial court's finding that Father did not remedy the conditions that led to the Children's placement. For these reasons, while we acknowledge Father's recent progress, we cannot conclude that the trial court erred or abused its discretion when terminating Father's parental rights pursuant to Section 2511(a)(2) in that the trial court's conclusions are supported by clear and convincing evidence in the record. *See S.K.L.R.*, 256 A.3d at 1123-24; *S.P.*, 47 A.3d at 826-27.

## Section 2511 (b) Determinations

We next review the trial court's conclusion that the involuntary termination of Father's parental rights best serves the Children's developmental, emotional, and physical needs pursuant to Section 2511(b). Father emphasizes that there is sufficient evidence of his strong bond with B.S.F., that the severance of the bond would be traumatic to B.S.F., and that Ms. Edmonds recommended that B.S.F. could have continued contact with both parents. Father's Brief at 35. Father contends that the lack of contact during the COVID-19 pandemic, as well as the Agency's refusals to allow additional holiday and birthday visits, impeded his ability to maintain a close relationship with the Children. *Id.* at 36. According to Father, the reports that B.S.F. wished to stay with resource parents by the final hearing on the termination of his parental rights were unreliable. *Id.* at 37. Father asserts

- 17 -

that the Children need permanency with him, and that the evidence established that he acted appropriately and cared for the Children. *Id.* at 38-39.

Appellees respond that the trial court appropriately considered Section 2511(b). They note, in part, that (1) the three year separation from parents "deeply hurt" B.M.F., GAL's Brief at 25; (2) the bond between L.S.F. and Father was not "particularly strong" and that B.M.F. realized that she was not safe with the parents, Legal Interest Counsel's Brief at 7; and (3) "the record demonstrated that Father had been unable to break the cycle of co-dependency he had with Mother and all the destructive behavior that went along with it thereby jeopardizing the well-being of [the Children,]" Agency's Brief at 27.

Section 2511(b) provides as follows:

> **(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S. § 2511(b).

It is well settled that

> [t]he emotional needs and welfare of the child have been properly interpreted to include "intangibles such as love, comfort, security, and stability." . . . [T]his Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention"

should be paid to discerning the effect on the child of permanently severing the parental bond.

***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013) (citations omitted).

With respect to the bond analysis pursuant to Section 2511(b), the ***T.S.M.*** Court explained, "the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition." ***Id.*** "Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." ***Id.*** at 268 (citation omitted). Moreover, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." ***Id.*** at 269.

Instantly, the trial court explained that its conclusion that termination of Father's parental rights was in the Children's best interests as follows:

> Here, the court had the benefit of an expert evaluator's assessment of the bond between the Children and the parents. The expert evaluator opined that there is a bond between Mother and Father and the Children and that the parental bond is particularly strong with B.M.F. and but not with L.S.F. However, the risks that caused the placement of the Children in the first place continue to exist. The evaluator concluded that termination of the parental rights is in the best interest of the Children. Mother and Father are not capable of providing the stability and security the Children need to flourish. It would be unconscionable to return the Children to an unsafe environment with incumbent risks of further trauma. It is apparent B.M.F. is very close to Mother and Father. This child has nevertheless come to a realization that she may not be able to return to . . . [the] parents and she is

comfortable with the concept of remaining with the resource family as her forever family.

The [GAL] and the Children's legal interest attorney, as well as the Children's [CASA], support termination of the parental rights. The court agrees. The Children deserve permanency and permanency will be achieved only by the termination of Mother and Father's parental rights.

Trial Ct. Op. at 53.

Following our review, we conclude that the record supports the trial court's determinations. As the trial court acknowledged, there was a bond between the parents and the Children, in particular, B.M.F., who was nearly six years old when the trial court adjudicated her dependent.[3] Although the trial court considered Father's bond with B.M.F. and his recent progress, the trial court credited Ms. Edmond's opinions that the Children's need for permanency and stability outweighed the Children's bonds with Father in addition to the totality of the evidence and circumstances considered throughout the history of this case. *See T.S.M.*, 71 A.3d at 267-68; *see also S.K.L.R.*, 256 A.3d 1108, 1123-24; *S.P.*, 47 A.3d at 826-27. Further, although Ms. Edmonds' stated that it would be optimal for the Children to have

_____

[3] As noted above, B.M.F. was living with a relative at the time of her adjudication of dependency. Further, the record shows that at the time when the Agency first removed L.S.F. from her home in 2018, she was less than a year old. Although there was evidence of a bond between L.S.F. and her parents, there was no evidence that termination of Mother's parental rights would impact L.S.F. negatively because of her bonds to the resource parents, her age, and the time spent in the Agency's care.

contact with Father and Mother, the child preparation worker, Kelly Campbell,[4] testified that B.M.F. understood the situations that caused her removal from the parents' care, has seen a school counselor and Ms. Campbell in anticipation of the termination of the parents' rights, and expressed love for the resource family. *See* N.T., 4/9/21 at 64-67; N.T., 9/3/20, at 75. Further, the record supports the trial court's Section 2511(b) determinations in light of Father's inability to maintain consistency, complete his permanency plan objectives, and the concerns regarding his co-dependency to Mother. *See* N.T., 3/11/21, at 49; *see also* Agency's Ex. 2 at 22. Accordingly, we discern no merit to Father's argument that the trial court erred or abused its discretion in rejecting his argument that he could best serve the Children's best interest, and we affirm the trial court's ruling pursuant to Section 2511(b). *See* *S.K.L.R.*, 256 A.3d at 1123-24; *S.P.*, 47 A.3d at 826-27.

For these reasons, we conclude that the trial court's decisions pursuant to Section 2511(a)(2) and (b) were proper, and we affirm the decrees terminating Father's parental rights to the Children.

Decrees affirmed.

_____

[4] Ms. Campbell testified at the April 9, 2021 hearing and stated that her job was to "answer questions that [a child] has and deal with the very heavy emotions that they may be feeling during that time." N.T. 4/9/21, at 60. She noted that her sessions with children were not therapy. *Id.* at 61.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>01/19/2022</u>